IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

RECEIVED

2008 MAR 12 P 2: 11

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| DEWAYNE MELTON, PIERRE HARVEY, LARRY AMOS, HENRY CODY, and J.T. BROOKS, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL DAIRY HOLDINGS, L.P.; DAIRY FRESH OF ALABAMA, LLC; and THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS LOCAL UNION NO. 991, <br><br> Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * |

Civil Action No. 1:08-CV-174

JURY DEMAND

## COMPLAINT

### I.     INTRODUCTION

1.     This is an action for declaratory judgment, equitable relief, and money damages, instituted to secure the protection of and to redress the deprivation of rights secured through 42 U.S.C. § 1981, which provides for relief against discrimination in employment on the basis of race and retaliation related thereto.  The Plaintiffs assert their claims for relief for the defendant's violations of §1981, via 42 U.S.C. §1983. The Plaintiffs seek compensatory and punitive damages, and request a trial by jury of all issues triable by a jury.  Further, the Plaintiffs seek attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## II.    JURISDICTION AND VENUE

2.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(4) and 28 U.S.C. §§ 2201 and 2202.  Supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367.

3.    A substantial portion of the unlawful employment practices alleged hereinbelow were committed by the Defendants within Houston County, Alabama.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

4.    The Plaintiffs request a jury trial on all issues pursuant to 42 U.S.C § 1981a.

## III.    PARTIES

5.    Plaintiff, DeWayne Melton, is an African-American male citizen of the United States, and a resident of the State of Alabama.  Mr. Melton is a former employee of the Defendants, National Dairy Holdings, L.P. and Dairy Fresh of Alabama, LLC, and a member in good standing of the International Brotherhood of Teamsters, Chauffers, Warehousmen and Helpers Local Union No. 991.

6.    Plaintiff, Pierre Harvey, is an African-American male citizen of the United States, and a resident of the State of Alabama.  Mr. Harvey is presently employed with the Defendants, National Dairy Holdings, L.P. and Dairy Fresh of Alabama, LLC,, and a member in good standing of the International Brotherhood of Teamsters, Chauffers, Warehousmen and Helpers Local Union No. 991.

7.    Plaintiff, Henry Cody, is an African-American male citizen of the United States, and a resident of the State of Alabama.  Mr. Cody is presently employed with the the Defendants, National Dairy Holdings, L.P. and Dairy Fresh of Alabama, LLC, and a member in good standing of the International Brotherhood of Teamsters, Chauffers, Warehousmen and Helpers Local Union No. 991.

8.    Plaintiff, Larry Amos, is an African-American male citizen of the United States, and a resident of the State of Alabama. Mr. Amos is presently employed with the Defendants, National Dairy Holdings, L.P. and Dairy Fresh of Alabama, LLC, and a member in good standing of the International Brotherhood of Teamsters, Chauffers, Warehousmen and Helpers Local Union No. 991.

9.    Plaintiff, J.T. Brooks, is an African-American male citizen of the United States, and a resident of the State of Alabama. Mr. Brooks is presently employed with the Defendants, National Dairy Holdings, L.P. and Dairy Fresh of Alabama, LLC, and a member in good standing of the International Brotherhood of Teamsters, Chauffers, Warehousmen and Helpers Local Union No. 991.

10.    Defendant, National Dairy Holdings, L.P. (hereinafter "NDH" or "Defendant"), is an employer doing business in Houston County, Alabama, and at all times relevant to this action, the defendant was the former employer and/or is the employer of the Plaintiffs within the meaning of 42 U.S.C. §1981. At all times relevant to this action the Plaintiffs were employees of NDH and were rightfully attempting to make and/or enforce the terms of contract(s) regarding their employment.

11.    Defendant, Dairy Fresh of Alabama, LLC (hereinafter "Dairy Fresh" or "Defendant"), is an employer doing business in Houston County, Alabama, and at all times relevant to this action, the defendant was the former employer and/or is the employer of the Plaintiffs within the meaning of 42 U.S.C. §1981. At all times relevant to this action the Plaintiffs were employees of Dairy Fresh and were rightfully attempting to make and/or enforce the terms of contract(s) regarding their employment.

12.    At all times relevant to this action, NDH acted as the employer and/or joint employer of the Plaintiffs with Dairy Fresh, and/or acted as an agent of Dairy Fresh.

13.    At all times relevant to this action, Dairy Fresh acted as the employer and/or joint employer

3

of the Plaintiffs with NDH, and/or acted as an agent of NDH.

14.    Defendant, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 991 (hereinafter "IBT"), at all times pertinent to this suit, is and/or was a labor organization representing employees in an industry affecting commerce. At all times relevant to this action the Plaintiffs were members in good standing of IBT and were rightfully attempting to make and/or enforce the terms of contract(s) regarding their employment.

## IV.    STATEMENT OF FACTS AND CLAIMS

15.    Plaintiffs re-allege and incorporate by reference paragraphs 1-14 above with the same force and effect as if fully set out in specific detail hereinbelow.

### Plaintiff DeWayne Melton

16.    On or about August 16, 2004, Plaintiff DeWayne Melton began working for NDH and Dairy Fresh as a transport/delivery driver. Plaintiff Melton was employed with these Defendants for approximately two and one half (2 ½) years until his unlawful termination on or about February 1, 2007.

17.    Throughout Plaintiff Melton's employment, he was subjected to a racially hostile and discriminatory environment, including, but not limited to, the following actions: being treated in a demeaning and discriminatory manner; being subjected to racially hostile jokes, not receiving adequate training; having his hours cut; not being considered for promotions; being assigned older, more rundown trucks; not being allowed to use vacation time as requested; being discriminatorily assigned attendance points; being disciplined for the same or similar actions for which white employees were not disciplined; being falsely accused of dishonesty/sleeping while on the clock; and on February 1, 2007, he was discriminatorily terminated.

4

18.     Plaintiff Melton was subjected to a more stringent disciplinary policy than the white drivers. Plaintiff Melton was written up on several occasions for not taking the "dumps," or old milk, off of his truck.

19.     Plaintiff Melton filed complaints stating the write ups were discriminatory as the white drivers who committed similar acts were not written up.

20.     However, Plaintiff Melton's complaints were ignored and he and other black drivers continued to be written up for not removing the "dumps".

21.     Almost all of the white drivers fail to remove the "dumps" from their truck and they were not disciplined.

22.     Plaintiff Melton was also written up for not cleaning out his truck.

23.     A white driver had left a tobacco "spit cup" in the cab of the truck to which Plaintiff Melton was assigned. When cleaning out the truck after his run, Plaintiff Melton left the cup in the truck as it was there when he had initially picked up the truck.

24.     Instead of writing up the white driver that left the cup the first time, the Supervisor wrote Plaintiff Melton up for not cleaning the truck.

25.     Plaintiff Melton filed a grievance with his union, IBD Local 991, regarding the write up; however, no action was taken on his behalf.

26.     Plaintiff Melton, as well as the other Plaintiffs, suffered discrimination in the way attendance points were assigned.

27.     When an employee receives eight (8) attendance points, he/she is terminated.

28.     It was well known to Plaintiff Melton, as well as the other Plaintiffs and other black

employees, that Defendants NDH and Dairy Fresh discriminatorily assigned points to the black drivers in an effort to terminate them.

29.     Plaintiff Melton was written up by Kama Bledsoe and Keith Onorato around the end of 2006 for having too many attendance points.

30.     Plaintiff Melton filed a grievance with his union, IBD Local 991, as he knew he should not have 6 ½ points as the supervisors had claimed.

31.     After a review of Melton's records, it was determined that the points had been inaccurately assigned and the points had to be removed.

32.     While employed with Defendant, Plaintiff Melton was also subjected to racially hostile jokes from the white drivers.

33.     On one occasion, Keith Onorato, Transport Manager, was present when such jokes were told and he took no disciplinary action against the white drivers telling the racially hostile jokes.

34.     Plaintiff Melton complained verbally to his Supervisor about the racist and demeaning jokes; however, his Supervisor did not taken any action to alleviate the hostile working environment and only told Plaintiff Melton not to pay any attention to the white drivers.

35.     Around the middle of 2006, Plaintiff Melton applied for a Lead Position which would give him first option at any open routes, more hours and more pay.

36.     However, the position was given to a white female who had only been with the company for about a month and who had less experience than Plaintiff Melton.

37.     Plaintiff Melton filed a grievance with his union, IBD Local 991, over the denial of the Lead Position.

6

38.     Instead of following normal grievance procedures, Onorato pulled Plaintiff Melton into his office and told Plaintiff Melton that he was not eligible for the position because he could not deliver to all of the stores because of problems he had experienced in the past. Therefore, he stated that Plaintiff Melton was ineligible for the position.

39.     Plaintiff Melton had had only one past issue with a store on his route that had been quickly resolved.

40.     The customer had never banned Plaintiff Melton from their store; it was the Defendants' decision to change his route.

41.     After the meeting with Onorato and several months after the store incident, Plaintiff Melton was written up for the store incident. The write up also contained information regarding two other alleged incidents at two different stores; one of which was a store to which Plaintiff Melton had never made a delivery.

42:     Plaintiff Melton had to once again file a grievance with his union, IBD Local 991, regarding the discriminatory write up.

43.     After an investigation, the write up was thrown out as untimely.

44.     The Supervisor repeatedly took hours away from Plaintiff Melton following any complaints and/or grievances filed by Plaintiff Melton.

45.     The Supervisor would then re-assign these hours to the white drivers.

46.     Plaintiff Melton also suffered discrimination in the way trucks were assigned for the delivery routes and was almost always assigned the trucks that were in the worst operable condition.

47.    When Melton asked his Supervisor how the trucks were assigned, the Supervisor told him that the better trucks were assigned to the drivers with the longest routes.

48.    However, this was not true; the better trucks were assigned to the white drivers.

49.    During his second year of employment, Plaintiff Melton requested vacation time. Dewayne Brown, a white driver, also requested vacation for the same time. The Supervisor approved vacation for both drivers.

50.    About three weeks prior to the scheduled vacation, the Supervisor informed Plaintiff Melton that he could not take vacation at the time he had requested.

51.    The Supervisor would not discuss the reasons for the denial of vacation with Plaintiff except to tell him that he could not allow but two drivers to take vacation at one time. When the week arrived, Plaintiff Melton learned that the Supervisor had taken his vacation away and given the time to another white driver.

52.    Plaintiff Melton complained to his Supervisors about the racial discrimination and harassment and also filed grievances with his union, IBD Local 991, about the racial discrimination and harassment.

53.    However, the Defendants took no action to stop or remedy the discrimination and it continued.

54.    Plaintiff Melton's personal vehicle was damaged in the employer Defendants' parking lot.

55.    To avoid more damage, Plaintiff Melton began parking next to the fence beside Plaintiff Cody's car in an area where white employees parked.

56.    About a week later, both Plaintiff Melton and Plaintiff Cody received letters on their

8

windshield from Brian Brewer, a white manager in the office, stating that they were not allowed to park their cars next to the fence.

57.     The white employees whose cars were parked in the same area next to the fence did not receive such letters.

58.     Plaintiff Melton asked his Supervisor about the letter, but was told he would have to go to the office for answers.

59.     Plaintiff Melton talked to Dee Brookshire, President, regarding the letter. Brookshire told Plaintiff Melton that he could not park in the area next to the fence. Plaintiff Melton told Brookshire about the damage to his car and that white employees parked in the same area. Brookshire told him there was nothing Dairy Fresh could do about the damage, that the surveillance cameras did not work and then he walked away without addressing why the white employees could park in the area and Melton could not.

60.     Plaintiff Melton filed a grievance with his union, IBD Local 991, regarding the damage to his car and the racially discriminatory parking practices.

61.     However, no action was taken with regards to these grievances.

62.     Ultimately, the Defendants' racial discrimination, harassment and retaliation culminated in Plaintiff Melton's termination on or about February 1, 2007.

63.     Plaintiff Melton was written up and terminated for alleged dishonesty.

64.     The charge against Melton was that he had allegedly slept on the clock, and was allegedly dishonest about when he left the Defendants' facility and when he arrived at the customer's location.

65.     Plaintiff Melton disagreed with the write up and filed a grievance with his union, IBD Local 991, regarding the write up and termination.

66.     Although Plaintiff Melton provided witness names and contact information as proof that he was en route to Montgomery at the time of the alleged sleeping incident, the employer Defendants and the Union Defendant failed to fully investigate his grievance or to talk to his witnesses.

67.     Instead, the Defendants took the word of a white driver as fact and upheld the termination.

68.     After Plaintiff Melton's termination, none of the Defendants would return Plaintiff Melton's telephone calls or answer his questions regarding the grievance status.

69.     Further, Onorato and another white employee tried to get other employees and union members (in violation of union guidelines) to sign a petition stating that they did not want Plaintiff Melton to return to work.

70.     Finally, Plaintiff Melton's arbitration hearing was held without his knowledge, and he was not afforded an opportunity to be present for the hearing as the Union Defendant failed to give him notice of the arbitration or to include him in any way.

### Plaintiff Pierre Harvey

71.     On or about October 17, 2005, Plaintiff Pierre Harvey began working for NDH and Dairy Fresh as a transport/delivery driver.

72.     Plaintiff Harvey is presently employed with NDH and Dairy Fresh and has been for approximately two (2) years.

73.     Throughout Plaintiff Harvey's employment, he was, and continues to be, subjected to a racially hostile and discriminatory work environment, including, but not limited to, the following actions: being treated in a demeaning and discriminatory manner; not receiving adequate training; having his hours and/or schedule arbitrarily changed; not being allowed to park in the same area as white drivers; being

10

assigned older, more rundown trucks; being discriminatorily assigned attendance points; and being

disciplined for the same or similar actions for which white employees were not and are not disciplined.

74.     Plaintiff Harvey was and is subjected to a more stringent disciplinary policy than the white

drivers.

75.     About six (6) months after he was hired, Plaintiff Harvey met Plaintiff Amos for lunch.

They parked their trucks behind a local mall and walked to a nearby restaurant for lunch.

76.     Both Plaintiffs were walking back to their trucks after eating lunch when they were

approached by Onorato.  He instructed them that they were not to park behind the mall and leave their

trucks.

77.     Several days later, both Plaintiffs were written up for being out of their route during their

lunch break.

78.     Plaintiffs were not aware of, nor have they seen any policy and/or rule regarding where

they are required to take their lunch break.

79.     White drivers almost always go out of their route to take lunch and/or meet other drivers

for lunch; however, they are not disciplined or punished.

80.     After they were written up, Plaintiff Harvey and Plaintiff Amos learned about a white driver

who frequently parked her company truck behind a grocery store to take her lunch break; left the truck

unattended; and on at least one occasion, could not be located for several hours.

81.     To Plaintiffs' knowledge, there was no disciplinary action taken against the white female

driver.

82.     Plaintiff Harvey complained about the discriminatory write up to his Supervisor and filed

grievance with his union, IBD Local 991, regarding the discriminatory write up; however, to his knowledge, no action was taken.

83.     Plaintiff Harvey was subjected to discriminatory scheduling practices by his Supervisor and Defendants NDH and Dairy Fresh.

84.     When originally hired, he was assigned a route which required him to work on Monday, Wednesday and Friday, and which left him free to care for his children on the weekends.

85.     Plaintiff Harvey's schedule was arbitrarily changed by his Supervisor to include a Saturday route; this change allowed a white driver to have Saturdays off.

86.     Plaintiff Harvey attempted to discuss the change with his Supervisor; however, he was told that he would have to use up his sick time if he wanted to be off on Saturdays.

87.     The Supervisor then told two white employees that he was going to force Plaintiff Harvey to use up all of his sick time.

88.     The first year that he worked, Plaintiff Harvey requested overtime, however, all of the overtime hours were assigned to white drivers.

89.     Recently, Plaintiff Harvey informed his Supervisor in writing that he no longer wanted to work overtime hours.

90.     Almost immediately, his Supervisor began scheduling Plaintiff Harvey to work overtime which forced ,and continues to force, Plaintiff Harvey to use sick time to cover the hours he cannot work.

91.     White drivers are asked if they want to work on a day off before they are scheduled to work, and are not forced to use their sick time.

12

92.    Sometime in April 2007, the Supervisor changed Plaintiff Harvey's schedule to include a route on Tuesday.

93.    Because his usual route did not include Tuesdays, Plaintiff Harvey had scheduled a doctor's appointment on one of the days he was now required to work and had to call in that day.

94.    Plaintiff Cody overheard the Supervisor make a comment that he was going to "fix" Plaintiff Harvey for calling in by making him take all of his sick time.

95.    On another occasion, Plaintiff Harvey and Plaintiff Cody were written up for leaving the plant at the same time although the Supervisor was aware that the reason they were leaving at the same time was because Plaintiff Harvey's truck was late being loaded and was no fault of the Plaintiffs.

96.    Further, on a separate occasion, they were both written up for arriving back at the plant at the same time.

97.    After being coached by Onorato (as witnessed by Plaintiff Melton), their Supervisor accused them of meeting up during their routes.

98.    After the write up, Plaintiff Harvey's route was changed and made longer.

99.    Following these write-ups, Plaintiff Harvey signed a union grievance, along with several other African American drivers, including three of the Plaintiffs in this case, on or about September 4, 2006, regarding racial discrimination.

100.    Plaintiff Harvey, as well as the other Plaintiffs, and other African American employees, has suffered and continues to suffer discrimination in the way attendance points are assigned.

101.    On numerous occasions, Plaintiff Harvey was written up for having too many points.

102.    However, after a review of his records, it was determined that the points had been

13

inaccurately assigned.

103.    When Plaintiff Harvey notified Kama Bledsoe, Human Resources Director, that he intended to file union grievances to get the points removed from his record so that he would not be terminated, she would eventually remove the points.

104.    This only served to further convince Plaintiff Harvey, and the other Plaintiffs, that the attendance points were being arbitrarily and disriminatorily assigned.

105.    On or about July 14, 2007, Plaintiff Harvey received a certified letter stating he had been assigned a full point for a tardy.    The letter also stated that he had already received 2.5 points.

106.    Given his prior problems with the attendance point system and his knowledge of the problems other African American drivers were having with the attendance point system, Plaintiff Harvey immediately contacted his Union Steward and informed him that he thought Bledsoe was intentionally discriminating against him and was attempting to use the point system to have him terminated.

107.    Plaintiff Harvey and the Union Steward went to Bledsoe's office that afternoon, and after investigating, found that there were several old, unsigned write ups in Plaintiff Harvey's file that should have been disposed of and not counted towards attendance points.

108.    Plaintiff Harvey requested copies of the write ups, and Bledsoe told him to come back on July 17, 2007, to pick up copies.

109.    The Union Steward asked why the old write ups were in the file and Bledsoe told him that it was a mistake.

110.    However, other black drivers have also experienced the same discriminatory practices in the assignment of attendance points.

14

111.     The Union Steward instructed Bledsoe to remove the 2.5 points from Plaintiff Harvey's attendance record.

112.     It was further discovered that pursuant to the company policy, that Plaintiff Harvey should have only received a half ( ½ ) point for the tardy; therefore, Bledsoe was told to reduce the point according to the guidelines.

113.     Plaintiff Harvey returned on July 17, 2007, to pick up the copies of the write-ups that he had requested; however, Bledsoe informed him that she had destroyed the write ups and had not retained any copies.

114.     Plaintiff Harvey called the Union Steward again and told him that Bledsoe had not given him the copies and had thrown away the write ups.

115.     The Union Steward contacted Bledsoe and she informed him that she had the copies and that Plaintiff Harvey could pick them up.  Plaintiff Harvey was only able to get copies of the write ups after the Steward instructed Bledsoe to provide copies a second time.

116.     Plaintiff Harvey also suffered discrimination and retaliation in the way trucks were assigned for the delivery routes as the Supervisor would assign him and other African American drivers the trucks that were in the worst operable condition.

117.     Plaintiff Harvey was frequently assigned truck #203 following Plaintiff Harvey's complaints of discrimination.

118.     Plaintiff Harvey and the other African American drivers complained to the supervisor about the condition of the truck, as it was not safe to drive on the road.

119.    To Plaintiff Harvey's knowledge, the Supervisor never assigned truck #203 to the white drivers.

### Plaintiff Henry Cody

120.    On or about February 15, 2005, Plaintiff Henry Cody began working for NDH and Dairy Fresh as a delivery truck driver. Plaintiff is presently employed with NDH and Dairy Fresh and has been for approximately two (2) years.

121.    Throughout Plaintiff Cody's employment, he was, and continues to be, subjected to a racially hostile and discriminatory environment, including, but not limited to, the following actions: being treated in a demeaning and discriminatory manner; not receiving adequate training; having his hours cut; not being allowed to park in the same area as white drivers, being assigned older, more rundown trucks, being discriminatorily assigned attendance points, and being disciplined for the same or similar actions for which white employees were not disciplined.

122.    Plaintiff Cody was and is subjected to a more stringent disciplinary policy than the white drivers.

123.    Plaintiff Cody, like Plaintiff Melton, was given a counseling statement for not taking the "dumps" or old milk off of his truck.

124.    However, as set out above, almost all of the white drivers fail to remove the "dumps" from their trucks and are not disciplined.

125.    Plaintiff Cody filed a grievance with his union, IBD Local 991, stating that he felt the disciplinary action was discriminatory because white drivers were not disciplined.

126.    Plaintiff Cody is aware that other African American drivers are disciplined regarding

"dumps" while the white drivers are not disciplined.

127.    Plaintiff Cody's personal vehicle was damaged in the employer Defendants' parking lot.

128.    Plaintiff Cody filed a complaint with the Defendants about this damage, however, nothing was done.

129.    To avoid further damage to his car, Plaintiff Cody began parking in an area where white employees parked.

130.    Every time Cody parked in this area, Onorato, would almost immediately tell Plaintiff Cody that he was not allowed to park in that area and that he had to move his car right away.

131.    When Plaintiff Cody questioned why he could not park there when white employees were allowed to park there, Onorato's response was that he did not ask Cody "all that" and reiterated that Cody was to stop parking in that area.

132.    To avoid further confrontation with Onorato, Cody moved the car to another area against the fence where other white drivers were parked.  Plaintiff Melton then began parking his car beside Plaintiff Cody's car.

133.    About a week later, both Plaintiff Cody and Plaintiff Melton received letters on their windshield from Brian Brewer, a white manager in the office, stating that they were not allowed to park their cars next to the fence.

134.    The white employees whose cars were parked in the same area next to the fence did not receive such letters.

135.    Immediately upon receiving the letter, Plaintiff Cody went to the office and asked Brewer why he had received the letter.

17

136.    Plaintiff Cody explained that the reason he had started parking there was due to the prior damage to his car.

137.    Brewer then cursed at Plaintiff Cody and told him not to park the car there anymore.

138.    Plaintiff Cody filed a grievance with his Shop Steward against Brewer for cursing at him and about the discriminatory parking practices.

139.    Brewer then filed a grievance against Plaintiff Cody for insubordination and stating that Plaintiff Cody was allegedly aggressive and loud when he had come into the office.

140.    The Union dismissed the grievance against Plaintiff Cody, as no witnesses would come forward to substantiate Brewer's claims.

141.    To Plaintiff Cody's knowledge, no action was taken by the Union regarding his grievance against Brewer.

142.    Shortly after Plaintiff Cody complained about the discriminatory parking practices, he was written up by his supervisors for allegedly meeting up with Plaintiff Harvey and making Plaintiff Harvey's run for him.  Plaintiff Harvey was also written up.

143.    Plaintiff Cody had gone into his Supervisor's office to turn in his paperwork for the day.

144.    His Supervisor immediately starting cursing at him, accused him of meeting up with Plaintiff Harvey and making Plaintiff Harvey's run for him.

145.    Plaintiff Cody denied the accusations and his Supervisor said that was a "damn lie".

146.    Plaintiff Cody immediately went to Onorato and complained about his Supervisor's discriminatory behavior and the write up.

147.    Onorato told Plaintiff Cody that he had instructed the Supervisor to write Plaintiff Cody up for the incident.

148.    Approximately two (2) weeks later, when it became apparent that no action was going to be taken about his complaint to Onorato, Plaintiff Cody filed a union grievance with his union, IBD Local 991, regarding his Supervisor's behavior, Onorato's lack of action, the property damage to his car and alleging racial discrimination by his Supervisor and other members of management at employer Defendants.

149.    About three weeks after the grievance was filed, the Union District Representative, Jim Gookins, met with Plaintiff Cody, Onorato and Bledsoe.

150.    The write up was dismissed due to lack of evidence, and Mark (LNU), a white employee in the office, informed Onorato that accidents in the parking area needed to be stopped. However, the complaints of racial discrimination were not addressed.

151.    After his complaints of racial discrimination, Plaintiff Cody's hours were also cut. He had been driving a route that ran five (5) days a week. After his complaints, the Supervisor took away one of the dates without any explanation.

152.    Plaintiff Cody has also been denied overtime work and/or being assigned extra routes when they are available.

153.    Plaintiff Cody, as well as the other Plaintiffs and other black drivers, have suffered and continue to suffer discrimination in the way attendance points are assigned.

154.    Plaintiff Cody, and the other Plaintiffs, have to keep a close watch on the attendance points assigned to them and have continuously received unwarranted points and write-ups for allegedly having too many points.

155.    Plaintiff Cody has repeatedly had to file union grievances to get the attendance points removed from his record so that he would not be terminated.

156.    On one occasion, Plaintiff Cody decided to check his attendance points. His file showed he had 4 ½ points, but there was no documentation to show why he had been given these points.

157.    Bledsoe had no explanation for why the points had been assigned, but Plaintiff Cody still had to file a union grievance to have the points removed.

158.    Cody asked for documentation regarding the attendance points and the employer Defendants refused to provide him with any paperwork.

159.    When he first began working for NDH and Dairy Fresh, Plaintiff Cody was assigned one of the newer trucks.

160.    After his complaints of racial discrimination were made, as set out above, this newer truck was re-assigned by the Supervisor to a white driver in retaliation for Plaintiff Cody's complaints.

161.    Plaintiff Cody complained about the condition of the truck that was then assigned to him; however, he was forced to use the older truck.

162.    On one occasion, a store owner in Warner Robbins became angry with Plaintiff Cody and informed him that he was not to come back to his store. Plaintiff Cody's route was changed so that he no longer had to deliver to the store.

163.    In April 2007, after his complaints of racial discrimination, Plaintiff Cody was again assigned to the store in Warner Robbins in retaliation for his complaints.

164.    Plaintiff Cody informed the employer Defendants that he was uncomfortable returning to

the store because he felt the store owner had mistreated him. Onorato told Plaintiff Cody that if he did not deliver milk to the store he would be terminated.

165.    On or about October 23, 2007, Plaintiff Cody was written up for alleged destruction of company property and insubordination regarding an allegation that he had hit a fence with a company vehicle. Plaintiff Cody denied that he did any such thing.

166.    Plaintiff Cody filed a union grievance regarding the write up as Bledsoe and Onorato would not give him the opportunity to defend himself and stated that the write up was discrimination based on his race. Instead, they took the word of the white supervisor and gave no credence to Plaintiff Cody's statement of events.

167.    Plaintiff Cody is aware of an incident wherein a white driver who had totaled out a truck and trailer and had lost all of the product in the trailer, yet was not disciplined.

168.    Plaintiff Cody is also aware of a white employee in the Shipping Department who has had numerous complaints filed against him with management for racial slurs and other discriminatory behavior. Defendants NDH and Dairy Fresh have not disciplined this employee and he is still employed with the Defendants.

**Plaintiff Larry Amos**

169.    On or about September 17, 1998, Plaintiff Larry Amos began working for NDH and Dairy Fresh as a delivery driver. He was subsequently terminated and then rehired on December 13, 1999.

170.    Plaintiff Amos is presently employed with NDH and Dairy Fresh and has been for nearly eight (8) years.

171.    Throughout Plaintiff Amos's employment, he was, and continues to be, subjected to a racially hostile and discriminatory environment, including, but not limited to, the following actions: being treated in a demeaning and discriminatory manner; termination; not receiving adequate training; denial of position(s); having his hours cut; being assigned older, more rundown trucks; being denied the opportunity to perform his duties as a "shop steward", and being disciplined for the same or similar actions for which white employees were not disciplined.

172.    Plaintiff Amos has been disciplined for the same or similar behaviors for which the similarly situated white drivers were not disciplined.

173.    Plaintiff Amos was suspended for receiving a speeding ticket while driving his own vehicle; however, white drivers who received speeding tickets while driving their own vehicles were not suspended.

174.    During his suspension, Plaintiff Amos was assigned to the Shipping Department to catch gallons as they came down the track.

175.    Plaintiff Amos had requested that he be given the position of "yard dog driver" which meant he would be moving the trailers around the lot as needed at the Defendants' plant.

176.    According to the Defendant, this position required a Class A CDL license.

177.    The employer Defendants stated that even though Plaintiff Amos had the required Class A CDL license, he was disqualified because he was under suspension. The position was given to a white driver.

178.    Presently, despite their stated policy, the employer Defendants allow a white driver with no Class A CDL license to move trailers when they need someone for the position.

179.    Also, as set out above, Plaintiff Amos received a verbal warning and a write up for being

outside of his route during his lunch break  White drivers are allowed to go outside their routes during their lunch break and are not subject to disciplinary actions.

180.    Plaintiff Amos filed a union grievance with IDB Local 991 regarding this write up as white drivers were allowed to take their lunch wherever and with whomever they chose.

181.    To Plaintiff Amos's knowledge, no action was taken by the Defendants following his grievance and the write ups were left in his file and in Plaintiff Harvey's file.

182.    Additionally, Plaintiff Amos was injured in an off the job automobile accident shortly after he was hired in September 1998.

183.    The Defendant attempted to force Plaintiff Amos to return to work prior to being released from the doctor.  When Plaintiff Amos could not go against his doctor's orders and instead requested light duty work, he was terminated.

184.    Although the Defendant re-hired Amos, he was given the most physically demanding job in the company.  He was also required to take a strength and stress test before he was re-hired and allowed to return to work.

185.    At the time, white drivers were not required to take such a strength/stress test.  In fact, Plaintiff Amos was the first employee required to take this test.

186.    White employees were, and continue to be, allowed to work light duty and are not terminated if they are injured in on or off the job accidents.

187.    Plaintiff Amos was suspended by the Defendant for approximately six months following an on the job accident where he drove into a pole causing approximately $1,200.00 worth of damage to his  trailer.

23

188.    Recently, a white driver completely totaled a truck and trailer while on the job, causing approximately $40,000.00 worth of damage, yet he was not terminated or disciplined in any manner.

189.    Additionally, on or about November 21, 2007, another white driver did not set his emergency brake, causing the truck to roll down a hill and hit a pole. The truck was brand new and the accident caused extensive damage to the truck. This driver was not disciplined for the accident, and was not subjected to a drug screen which according to the Defendants' policy, is required following an accident.

190.    Other white drivers have had on the job accidents which caused damage to their trucks and/or trailers, and they have not been disciplined by the Defendants.

191.    Additionally, white employees have lost product due to common carelessness thus costing the company thousands of dollars. These white employees were not disciplined, suspended and/or terminated.

192.    Plaintiff Amos also suffered discrimination and retaliation in the way trucks were assigned for the delivery routes as the Supervisor would assign him and other African American drivers the trucks that were in the worst condition.

193.    Plaintiff Amos was frequently assigned trucks that were in poor operable condition.

194.    Plaintiff Amos complained to the Supervisor about the condition of the trucks as they were not safe to drive on the road.

195.    Plaintiff Amos was aware that if these trucks happened to be assigned to the white drivers the white drivers would refuse to drive the truck and the Supervisor would assign them a different truck.

196.    If a black driver refused to drive the assigned truck or complained, they were taken to

24

Human Resources and/or given a write up by the Supervisor.

197.    Plaintiff Amos has the title of Shop Steward, a position in the Union.  He was voted into this position by the other drivers in 2000 and has held the position since that time.

198.    The Union Defendant also has two white Shop Stewards.

199.    As part of their duties, the Shop Stewards take complaints and/or grievances from union members and attempt to resolve them or they direct the complaints/grievances to management.

200.    Although he has the same title, the Union Defendant does not treat Plaintiff Amos the same as the two white Shop Stewards.

201.    Instead, the Union promoted one of the white Shop Stewards to Senior Steward, although Plaintiff Amos had more seniority and had been a Shop Steward longer than either of the white Shop Stewards.

202.    The Union Defendant ignores the complaints Plaintiff Amos presents to them or it fails to address the problems.

203.    The Union Defendant has given all of the authority to the white Shop Stewards, while giving Plaintiff Amos little or no authority to handle problems when they are presented to him.

204.    Further, the District Union Representative fails to return calls to Plaintiff Amos and only comes to the Plant when he knows that Plaintiff Amos will be out on his route.

205.    Plaintiff Amos, and other black drivers, are given less hours than white drivers who were hired after him/them.

206.    Plaintiff Amos has tried to file grievances for himself and the other black drivers for

violations of seniority in scheduling hours; however, the white Shop Steward overrides his grievances and keeps them from being filed with the Union.

207.    The Supervisor has repeatedly and arbitrarily taken hours away from Plaintiff Amos and given them to white employees with less seniority.

208.    Plaintiff Amos filed complaints/grievances when his hours were taken; however, no action was taken.

209.    Plaintiff Amos has also requested additional hours, but the Supervisor usually ignores his requests.

210.    The racial discrimination by the Defendants is so pervasive that Plaintiff Amos attempted to obtain a job as a driver with another company. However, Plaintiff Amos was given a bad reference by Onorato, who falsely reported that Amos had several wrecks and suspension on his record.

211.    As part of his duties as Shop Steward, Plaintiff Amos opposed the employer Defendants' implementation of the attendance point system, given his past experience with a point system.

212.    Defendants NDH and Dairy Fresh used and continues to use the attendance point system against black employees by discriminatorily assigning them points and ultimately terminating them for receiving too many points.

213.    Few, if any, white employees are terminated as a result of receiving too many attendance points.

214.    Further, as Shop Steward, Plaintiff Amos has discussed with Onorato the discriminatory hiring practices of the Defendant.

215.    Plaintiff Amos informed Onorato that he felt there was a discrepancy in the number of

26

black applicants hired as opposed to the number of white applicants hired. He further informed Onorato that black applicants were subjected to more stringent application procedures than the white drivers.

216.    Onorato brushed aside Plaintiff Amos's concerns and the discriminatory hiring practices continue without change.

217.    Over his years with the Defendant, it has been Plaintiff Amos's experience that black employees were more likely to be subjected to "random" drug screens than white employees.

218.    Upon information and believe, Defendants NDH and Dairy Fresh single out black employees for drug tests.

219.    Plaintiff Amos is aware that numerous black employees filed grievances against the employer Defendants for discriminatory drug screens. Most, if not all, of these black employees were ultimately terminated.

### Plaintiff J.T. Brooks

220.    On or about October 26, 2006, Plaintiff J.T. Brooks began working for NDH and Dairy Fresh as a delivery/transport driver. Plaintiff Brooks is presently employed with NDH and Dairy Fresh and has been for approximately one (1) year.

221.    Throughout Plaintiff Brooks' employment, he was, and continues to be, subjected to a racially hostile and discriminatory environment, including, but not limited to, the following actions: being treated in a demeaning and discriminatory manner; discrimination in hiring; not receiving adequate training; having his hours and schedule changed and/or cut without warning and despite a contracted run; being disciplined for the same or similar actions for which white employees were not disciplined; and being discriminatorily terminated for off the job injuries.

27

222.    From the time he applied for employment with the Defendants, Plaintiff Brooks has experienced racial discrimination and harassment.

223.    When he applied for the position of Transport Driver, Onorato required Plaintiff Brooks to undergo a physical fitness test.

224.    The employer Defendants' medical examiner would not clear Plaintiff Brooks for a job because he stated that Plaintiff Brooks allegedly had high blood pressure. After the Defendants' physical, Plaintiff Brooks went to his own personal doctor four (4) days in a row and had his blood pressure checked. His doctor informed him that his blood pressure was normal and provided a letter for Plaintiff Brooks to deliver to the Defendants.

225.    Onorato initially stated the letter was "not enough" to allow Plaintiff Brooks to be hired; however, Onorato finally hired Plaintiff Brooks when Plaintiff Brooks suggested that he would return to his personal doctor and let him know that the letter was "not enough" and further proof was needed regarding his blood pressure.

226.    Plaintiff Brooks was assigned to train with a contracted driver who was not a Defendant employee. Plaintiff Brooks was supposed to train for two weeks with Clinton Hobbs, Wayne Brown or Cedric Brown; however, he only received one week of training from a non-Defendant employee.

227.    On or about April 25, 2007, Plaintiff Brooks was written up by his Supervisor for carrying a personal cell phone.

228.    White drivers were carrying, and continue to be allowed to carry, and use their personal cell phones while running their routes and they are not disciplined.

229.    When Plaintiff Brooks informed his Supervisor that he felt the write up was unjust and

28

discriminatory, the Supervisor became very upset and verbally attacked Plaintiff Brooks.

230.    Plaintiff Brooks filed a union grievance regarding his Supervisor's unprofessional and discriminatory actions; however, no action was taken against the Supervisor.

231.    Plaintiff Brooks was not afforded the same benefits as the white employees with regards to work schedules.

232.    The employer Defendants refused to accommodate Plaintiff Brooks' schedule requests; however, white employees were allowed to change or "set" their schedules.

233.    On or about May 29, 2007, Plaintiff Brooks' Supervisor informed Plaintiff that he and Plaintiff Amos were being unilaterally removed from the schedule on Tuesdays.

234.    Plaintiff Brooks reminded his Supervisor that he could not work weekends because he had to care for a sick family member.

235.    Plaintiff Brooks filed a union grievance alleging discriminatory scheduling practices; however, his schedule was not changed.

236.    Plaintiff Brooks was forced to use his sick days to cover the weekends that he could not work.

237.    The schedules of white drivers are not changed unless the changes are discussed with the white drivers and are approved by the white drivers.

238.    On or about June 26, 2007, Plaintiff Brooks was involved in an off the job, motorcycle accident.

239.    As soon as he was released from the hospital, Plaintiff Brooks applied for short term disability and Family Medical Leave, as he was not able to immediately return to work.

240.    Both of these requests were unilaterally denied by Bledsoe.

241.    On or about July 10, 2007, Plaintiff Brooks was released to return to work on "light duty"status.

242.    Plaintiff Brooks applied for light duty, and once again, Bledsoe denied the request.

243.    Ignoring Plaintiff Brooks' requests for short term disability, FMLA leave and light duty, Bledsoe instead assigned attendance points for everyday that Plaintiff Brooks was out of work, suspended him and ultimately terminated him for having too many attendance points.

244.    Unlike the African American employees, white employees were, and continue to be, allowed to take a leave of absence and/or they are allowed to work light duty following off the job injuries.

245.    Further, by terminating Brooks, the Defendants were able to keep Plaintiff Brooks from receiving his short term disability benefits.

246.    Plaintiff Brooks filed Union grievances regarding his suspension and his termination. He was ultimately returned to work on July 27, 2007.

247.    Plaintiff Brooks was not afforded the benefit of a hearing and he did not fully agree with the terms of reinstatement, however he signed the reinstatement document because he felt he had no choice and needed his job back.

248.    To be reinstated, Plaintiff Brooks had to agree that his regular route included Saturdays when the Defendants knew that he could not work Saturdays (and had re-assigned the Saturdays to a white driver during the period of his termination) and he also had to agree that he would not receive backpay which Plaintiff Brooks should have received given that he was discriminatorily terminated.

249.    On or about August 8, 2007, Plaintiff Brooks received a telephone call from the

30

Montgomery Unemployment Office accusing him of giving them false information regarding his termination.

250.    When contacted following Plaintiff Brooks' unemployment claim, Bledsoe had knowingly and intentionally reported falsely to the unemployment office that Plaintiff Brooks was on a leave of absence during the month he was out of work in an effort to keep Plaintiff Brooks from receiving his rightfully earned unemployment benefits.

251.    Additionally, Bledsoe did not turn in the information to allow Plaintiff Brooks to receive his short term disability payments from the policy paid through his pay deductions. About a week after Plaintiff Brooks was returned to work following his grievance, he had to again confront Bledsoe about having his unemployment and short term disability paperwork filed.

252.    Finally, about six weeks after his accident, Plaintiff Brooks received an unemployment check, but it took several more struggles with Bledsoe before he was able to get his short term disability.

253.    On or about September 20, 2007, Plaintiff Brooks and Plaintiff Harvey were told by their African-American Supervisor that the Defendant discriminated in its hiring policies.

254.    On one occasion, Plaintiffs' Supervisor was very irate and complained that because he was an African American, he was not allowed to hire or fire anyone1; however, the white supervisors in other departments equal to him were allowed to hire and fire.  The Supervisor complained that there were approximately 35 white drivers and only eight minority drivers.

255.    The employer Defendants held African American applicants to higher standards than white applicants.

256.    Plaintiffs' Supervisor attempted to report the discriminatory hiring and firing practices to Onorato, but the only response received was a threat to his job/position.

257.    Since his employment has been reinstated, Plaintiff Brooks has been retaliated against in that his trailer is constantly overloaded in violation of Federal guidelines.

258.    Plaintiff Brooks has attempted to talk to the Supervisor regarding this problem and was told that the company was aware of the weight issues. Plaintiff Brooks has to either argue with management to get them to remove the overloaded product which makes him late getting to the stores on his route, or he has to make the run with the overloaded trailer.

259.    Recently, Plaintiff Brooks filed a grievance against Tim Brown, the Shipping Department Supervisor, for racial discrimination and harassment.

260.    Plaintiff Brooks' route had been delayed for about four hours, and he went to the Shipping Department to see how much longer the delay would be. He was talking to Bruce McNealy, a black male who worked in the department, about the delay.

261.    As soon as Brown saw Plaintiff Brooks, he approached Brooks, became verbally abusive and told Plaintiff Brooks to get out of the department. Brown also verbally harassed McNealy for talking to Plaintiff Brooks.

262.    There were white employees in the department standing around talking, but Brown did not say anything to them.

263.    Further, the white employees hired after all of the Plaintiffs for the same or similar positions were and are assigned better routes and more hours than are the Plaintiffs.

264.    White employees/drivers are assigned the newer trucks and/or are given the trucks in the best condition while black drivers who have been with the Defendant Company longer and who have longer routes are assigned the rundown and older trucks.

265.    Plaintiff Harvey has the longest route assigned by the Defendants, and he is almost always assigned an older truck.

266.    Additionally, white employees are allowed to park their personal cars in handicapped areas and other areas of the parking lot that are restricted from black employees. If black employees park in these areas they receive write-ups and/or are suspended.

267.    The black drivers, including the Plaintiffs, are and were reprimanded for not keeping their hours under a certain time; however, the white drivers were not reprimanded for the same or similar time issues.

268.    On or about September 4, 2006, several African American drivers, including four of the Plaintiffs, filed a union grievance alleging discrimination on this matter; however, the Defendants brushed aside their complaints.

269.    In the same grievance, the African American drivers also stated that the employer Defendants discriminated by not allowing the African American drivers to adequately defend themselves when accused of and/or written up for policy violations.

270.    It was determined this was a problem; however, Mark Roberts, Regional Human Resources Manager, determined that it was not racial discrimination, but only "communication and interpersonal skill concerns." To Plaintiffs' knowledge, no action was taken by Defendants to remedy the situation.

271.    The racially hostile work environment and discrimination was, and continues to be so severe and/or pervasive that it interfered with, and continues to interfere with Plaintiffs' work and/or ability to work.

33

272.    Upon information and belief, Defendants NDH and Dairy Fresh have a policy of discriminatory hiring and firing practices. Defendants NDH and Dairy Fresh overlook black applicants applying for driver positions in favor of white applicants with less experience. Further, Plaintiffs have knowledge of several black office employees who were terminated and/or forced to leave their jobs because of the discriminatory policies of the Defendants.

273.    Defendants NDH and Dairy Fresh, by and through their agents or supervisors engaged, authorized, ratified and condoned a pattern and practice of unlawful harassment and discrimination by allowing Plaintiffs to be subjected to unwelcome, uninvited racial harassment and disparate treatment, including but not limited to, being treated in a demeaning and discriminatory manner; not receiving adequate training; having their hours cut and/or their schedules changed without warning and despite contracted routes; not being considered for promotions and/or management positions; being disciplined for the same or similar actions for which white employees were not disciplined; being falsely accused of stealing time; and for Plaintiffs Melton, Amos and Brooks being discriminatorily suspended and/or terminated; and other terms, conditions, and benefits of their employment, as set out in detail above.

274.    The unwelcome racial harassment and discrimination created an intimidating, oppressive, hostile, and offensive work environment which interfered with Plaintiffs' emotional and physical well being and their ability to perform their work.

275.    The Defendants had actual and constructive knowledge of this conduct, but failed to take all reasonable steps to prevent the racial discrimination, harassment and retaliation from occurring and to protect Plaintiffs from further harassment and discrimination.

276.    The employer Defendants retaliated against the Plaintiffs in response to their good faith

opposition to the racially hostile environment and race discrimination by taking adverse employment actions

against them, including but not limited to, being treated in a demeaning and discriminatory manner; having

their hours cut and/or their schedules changed; not being considered for promotions and/or management

positions; being disciplined for the same or similar actions for which white employees were not disciplined;

being falsely accused of stealing time; and for Plaintiffs Melton, Amos and Brooks being discriminatorily

suspended and/or terminated; and affecting other terms, conditions, and benefits of their employment, as

set out in detail above.

## COUNT ONE: §1981 VIOLATIONS
## RACIAL HARASSMENT, DISCRIMINATION & RETALIATION
## (AS ASSERTED VIA 42 U.S.C. §1983)

277.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 276 above with the

same force and effect as if fully set out in specific detail herein below.

278.     The Defendants intentionally and maliciously discriminated against the Plaintiffs in the terms,

conditions and benefits of their employment including hiring, training, promotions, wages, assignment of job

duties, work hours, work conditions, overtime, discipline, termination, and subjecting Plaintiffs to a higher

level of scrutiny than white co-workers, at least in part, on the basis of their race, African American.

279.     As set out in detail above, in retaliation for the Plaintiffs' good faith opposition to racial

harassment and racial discrimination, the Defendants took adverse employment actions against them,

including but not limited to, being treated in a demeaning and discriminatory manner; having their hours cut

and/or their schedules changed; not being considered for promotions and/or management positions; being

disciplined for the same or similar actions for which white employees were not disciplined; being falsely

accused of stealing time; and for Plaintiffs Melton, Amos and Brooks being discriminatorily suspended

and/or terminated; and affecting other terms, conditions, and benefits of their employment, as set out in detail above.

280.   The Defendants engage in a pattern and practice of race discrimination in hiring, job assignments, training, promotions, discipline, termination, and other terms, conditions and privileges of employment and retaliated against Plaintiffs in that the conduct was willful, malicious and in wanton disregard of Plaintiffs' federally protected rights.

281.   The Plaintiffs made several, good faith complaints in opposition to racial discrimination against themselves and other African-American employees.

282.   As is discussed above, the Defendants subjected Plaintiffs to retaliation at least in part for their opposition to race discrimination, by harassing them, demeaning them, and cutting their hours. Further, Plaintiff Melton was ultimately terminated, in whole or in part, on or about February 1 2006, for his said opposition to racial discrimination and because of his race, African American.

283.   The Defendants' conduct was retaliation based, at least in part, on the Plaintiffs' protected activities of opposing racial discrimination.

284.   The unlawful actions of the Defendants, as set forth above, constitute a practice, pattern, custom or policy of the Defendants for allowing acts of racial harassment, racial discrimination and/or retaliation in violation of its employees' and members' federally protected rights.

285.   The conduct of the Defendants was so pervasive as to create a racially hostile working environment for the Plaintiffs.

286.   Defendants knew, or should have known, of the racial discrimination, racial harassment and retaliation of the Plaintiffs.

36

287.    The Defendants failed to take any prompt and effective remedial action reasonably calculated to result in the prevention and/or remedy of the racial harassment, racial discrimination and/or retaliation of the Plaintiffs.

288.    The Defendants thus have violated the proscriptions against race discrimination, racial harassment and retaliation under 42 U.S.C. § 1981.

289.    As the result of the Defendants' conduct, the Plaintiffs were deprived of income and other benefits due them. Plaintiffs also suffered embarrassment, humiliation, inconvenience, and mental distress.

290.    The Defendants engaged in the practices complained of herein with malice and/or with reckless indifference to the Plaintiffs' federally protected rights.

291.    Plaintiffs suffered damages as a proximate result of these violations, which were caused by the Defendants' policy or custom and/or a failure to adequately train caused by deliberate indifference to the Plaintiffs' rights and/or by deliberate indifference to those violations.

292.    Plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and this suit for a declaratory judgment, backpay, an injunction, and compensatory and punitive damages is their only means of securing adequate relief.

293.    Plaintiffs are suffering and will continue to suffer irreparable injury from the Defendants' unlawful conduct as set forth herein unless enjoined by this Court.

## V.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that this Court assume jurisdiction of this action and after trial:

1.    Grant Plaintiffs a declaratory judgment holding that actions of Defendants described herein above violated and continue to violate the rights of the Plaintiffs as secured by §1981.

2.    Grant Plaintiffs a permanent injunction enjoining Defendants, their agents, successors, employees, attorneys and those action in concert with Defendants and on Defendants' behalf from continuing to violate §1981.

3.    Grant the Plaintiffs an Order requiring the Defendants to make the Plaintiffs whole by awarding them the positions they would have occupied in the absence of racial discrimination and retaliation (or front pay), backpay (plus interest), compensatory, punitive, and/or nominal damages, and loss of benefits.

4.    The Plaintiffs further pray for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorneys' fees and expenses.


Respectfully submitted,


ANN C. ROBERTSON
TEMPLE D. TRUEBLOOD
Attorneys for the Plaintiffs


OF COUNSEL:
WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama  35203
(205) 314-0500

BOBBIE S. CROOK (CRO-040)
Attorney for the Plaintiff
367 South Saint Andrews Street
Dothan, Alabama 36301
(334) 671-8062


**PLAINTIFFS DEMANDS A TRIAL BY STRUCK JURY ON ALL ISSUES TRIABLE BY A JURY.**

_OF COUNSEL_


**PLAINTIFFS REQUESTS THIS HONORABLE COURT TO SERVE VIA CERTIFIED MAIL UPON EACH OF THE NAMED DEFENDANTS THE FOLLOWING : SUMMONS, COMPLAINT.**

**Defendants' Addresses:**

**National Dairy Holdings, LP**
**3811 Turtle Creek Blvd.;  Suite 1300**
**Dallas, Texas  75219**

**Dairy Fresh of Alabama, LLC**
**c/o   Registered Agent**
**The Corporation Company**
**2000 Interstate Park Drive;  Suite 204**
**Montgomery, Alabama  36109**

**International Brotherhood of Teamsters, Chauffers,**
**  Warehousmen and Helpers Local Union No. 991.**
**112 S. Board Street**
**Mobile, Alabama 36602**

_OF COUNSEL_

39

DUPLICATE

Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602004292
Cashier ID: brobinso
Transaction Date: 03/12/2008
Payer Name: WIGGINS CHILDS QUINN PANTAZIS
------------------------------------
CIVIL FILING FEE
 For: WIGGINS CHILDS QUINN PANTAZIS
 Case/Party: D-ALM-1-08-CV-000174-001
 Amount:        $350.00
------------------------------------
CHECK
 Check/Money Order Num: 014557
 Amt Tendered: $350.00
------------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00

MELTON ET AL V. NATIONAL DAIRY ET
AL